# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
### 5:18-cv-00057-MR

| | | |
|---|---|---|
| JAMES W. LOMICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | <u>ORDER</u> |
| | ) | |
| KEN BEAVER, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment. [Doc. 72].

## I.    PROCEDURAL BACKGROUND

Pro se Plaintiff James W. Lomick ("Plaintiff") is a North Carolina inmate currently incarcerated at Tabor Correctional Institution in Tabor City, North Carolina. [Doc. 81-11]. Plaintiff filed this action on April 2, 2018, pursuant to 42 U.S.C. § 1983, against Defendants Ken Beaver, identified as the Superintendent of Lanesboro Correctional Institution1 ("Lanesboro") and Jane Doe, identified as a correctional officer at Lanesboro, for their alleged deliberate indifference to Plaintiff's safety and well-being while he was

---

1 Subsequent records show that Defendant Beaver was the Assistant Superintendent of Lanesboro, not the Superintendent. [See Doc. 73-2 at ¶ 2].

housed at Lanesboro. Plaintiff alleged that Defendants violated his rights under the Eighth Amendment by failing to protect Plaintiff from being stabbed repeatedly by another inmate, Reginald Gray, on December 5, 2016. [Doc. 1].

On May 16, 2018, Plaintiff voluntarily dismissed his Complaint. [Doc. 9]. A couple of months later, the Court granted Plaintiff's motion to "reopen" his case. [Docs. 12, 14]. On August 14, 2018, the Court conducted its initial review of Plaintiff's Complaint, allowing Plaintiff's failure-to-protect claim against Defendants Beaver and Doe to proceed. [Doc. 20]. Thereafter, Plaintiff moved for leave to amend his Complaint, which the Court granted. [Docs. 26, 27]. In Plaintiff's Amended Complaint, he again named Ken Beaver as a Defendant and added Defendants "Dave" Mitchell, Jeffrey G. Krantz, Christy Bynum, and Breanna Jackson. [Doc. 31 at 2-4]. After Defendants Beaver and Bynum answered Plaintiff's Amended Complaint, Plaintiff moved again for leave to amend his Complaint, which the Court again granted. [Docs. 34, 35]. In his Second Amended Complaint, Plaintiff added Defendant "George Sodom," who was later identified as George Solomon, the Director of Prisons. [See Doc. 36]. Thereafter, the Court allowed Plaintiff to amend his Complaint yet again. [See Docs. 42-44]. In this Third Amended Complaint, Plaintiff dropped Defendants Bynum,

2

Jackson, and Krantz; maintained his claims only against Defendant Beaver, Mitchell[2] and Solomon; and added Defendant Maranda Mims. [See Doc. 44]. Plaintiff asserts claims against these Defendants in their individual and official capacities. [See id. at 2-3]. Plaintiff's action proceeded on this Third Amended Complaint.

On March 16, 2020, Defendants moved for summary judgment.[3] [Doc. 72]. In support of their motion, Defendants submitted affidavits, various prison records, a number of prison policies, and an article about staffing changes at Lanesboro.[4] On March 17, 2020, the Court entered an order in

---

[2] Plaintiff identified Defendant "Dave" Mitchell simply as "administration." [Doc. 44 at 2]. Defendant R. David Mitchell was the Superintendent of Lanesboro at the relevant times.

[3] The dispositive motions deadline in this case was March 14, 2020. [Doc. 70]. Defendants failed to move for leave to file their motion out of time. The Court can only assume, therefore, that this missed deadline (and failure to seek leave to file the motion out of time) were the result of an initial and unnoticed calendaring error and not a lack of respect for the Court's deadlines. Given the only two-day delay in filing the motion, the Court will, *sua sponte*, afford Defendants this additional time.

[4] Defendant Mitchell's Declaration, which was signed by Mitchell on March 17, 2020, was not filed until March 18, 2020. [See Doc. 75-1 at 1]. Counsel provides no explanation for this untimely filing and, again, fails to move for leave to file it out of time. In his brief, counsel merely wrote that he "anticipates receiving a signed Declaration from Defendant Mitchell as well." [Doc. 73 at 4 n.1]. Unlike the summary judgment motion, counsel's failure to file this Declaration until two days after filing the summary judgment motion cannot be similarly understood or forgiven. The Court will, therefore, strike this Declaration and strongly admonishes counsel against future failures to comply with the Court's deadlines. It is counsel's duty to track and adhere to Court deadlines and to properly acknowledge and correct errors when they are made, not to simply file things out of time, hope for the best, and waste the Court's resources addressing his errors. The Court notes that Defendant Mitchell's Declaration parrots the Declarations of the other Defendants in this matter and presents nothing determinative, in any event.

accordance with <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), ordering that Plaintiff had fourteen (14) days to respond to the Defendants' motion and notifying Plaintiff that the "[f]ailure to file a timely and persuasive response will likely lead to the dismissal of this lawsuit against Defendants." [Doc. 74 at 3]. As such, Plaintiff's response was due on March 31, 2020. On Plaintiff's motion, the Court granted Plaintiff an extension of time to file a response to Defendants' motion for summary judgment, which made Plaintiff's response due by April 17, 2020. [Docs. 76, 78]. Plaintiff, however, did not file his response until May 18, 2020.[5] [<u>See</u> Doc. 81].

The <u>Roseboro</u> Order also advised Plaintiff of the requirements for filing a response to the summary judgment motion and the manner in which evidence could be submitted to the Court. [<u>Id.</u>]. The Plaintiff was specifically advised that he "may not rely upon mere allegations or denials of allegations in his pleadings to defeat a summary judgment motion." [<u>Id.</u> at 2]. Rather, he must support his assertion that a fact is genuinely disputed by "citing to

---

[5] The envelope in which Plaintiff's response was transmitted is postmarked May 14, 2020. [<u>See</u> Doc. 81-11]. While the documents included in his response are dated April 8, 2020, [<u>see</u> Doc. 81 at 19, 20; Doc. 81-2 at 1, 2, 6, 7, 11, 12], the cover letter, which was handwritten by Plaintiff, is dated May 13, 2020. [<u>See</u> Doc. 81-1 at 2]. Plaintiff sought no additional extension of time to file his response and provides no explanation for this nearly month-long delay in filing his response. And no reason for the delay otherwise appears from the record. The Court, however, for the sake of addressing the merits of Plaintiff's claims, will <i>sua sponte</i> extend the deadline for Plaintiff to file a response and deem his response timely filed.

particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulation (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." [Id. (citing Fed. R. Civ. P. 56(c)(1)(a))]. The Court further advised that, "[i]f Plaintiff has any evidence to offer to show that there is a genuine issue for trial," "he must now present it to this Court in a form which would otherwise be admissible at trial, i.e., in the form of affidavits or unsworn declarations."

> An affidavit is a written statement under oath; that is, a statement prepared in writing and sworn before a notary public. An unsworn statement, made and signed under the penalty of perjury, may also be submitted. Affidavits or statements must be presented by Plaintiff to this Court no later than fourteen (14) days from the date of this Order and must be filed in duplicate.

[Id. at 2-3 (citing Fed. R. Civ. P. 56(c)(4))].

In his untimely response, Plaintiff filed a handwritten "Brief in Support of Plaintiff Response in Opposition to Defendant's Motion(s) for Summary Judgment," together with handwritten responses to the Declarations filed by Defendants, various prison records and policies, and a few excerpts from Plaintiff's medical records. [See Doc. 81-1 to 81-10]. Despite having been given specific instructions in this Court's Roseboro Order [Doc. 74], Plaintiff

5

filed no affidavits under oath or statements under penalty of perjury. On the second page of his response, however, Plaintiff asserts that "he can not swore do to His religion practice, he do certify. The Statement and fact is written in the form of a Affidavit is true and nothing but the truth." [Doc. 81 at 2]. Various pages throughout the response are signed by a notary but not actually signed by Plaintiff, despite the notary's attestation that "James Lomick personally appeared befor [*sic*] me this day 8th April 2020 and signal [*sic*] of this document." [See e.g., Docs. 81 at 19 and 81-2 at 6, 11]. Nor does Plaintiff purport to make these statements on personal knowledge or claim that he is competent to testify on the matters stated therein. See Fed. R. Civ. P. 56(c)(4). The Court does note, however, that Plaintiff's original complaint filed in this matter was signed under penalty of perjury, [Doc. 1 at 16], even though his subsequent Amended Complaints were not. [Docs. 31, 44]. In short, Plaintiff submitted nothing in response to the Motion for Summary Judgment that the Court could accept as a forecast of evidence, as required by Rule 56, that could be used to rebut an absence of a genuine issue of fact, if established by Defendant, even if they had been timely filed. The Court, therefore, allowed Plaintiff multiple opportunities to correct this deficiency by directing Plaintiff to certify under oath or penalty of perjury "that his previously submitted statements are true of his personal knowledge (or

6

identifying such portions thereof as to which he can so attest)." [Docs. 86, 89]. Finally, on November 12, 2020, Plaintiff filed a Declaration satisfying the Court's direction and verifying under penalty of perjury his previously submitted factual statements at Docket Nos. 81 and 88 "are true and correct to the best of [his] personal knowledge." [Doc. 90].

As such, the evidentiary forecast before the Court consists of the materials submitted by Defendants [Doc. 73] and the materials submitted by Plaintiff [Docs. 81, 88].

This matter is now ripe for adjudication.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

"[I]n considering a motion for summary judgment, the district court 'must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.'" Robinson v. Wix Filtration Corp., 599 F.3d 403, 409 n. 8 (4th

8

Cir. 2010) (quoting <u>Custer v. Pan Am. Life Ins. Co.</u>, 12 F.3d 410, 416 (4th Cir. 1993)) (emphasis in original).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. <u>Anderson</u>, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" <u>Ricci v. DeStefano</u>, 129 S. Ct. 2658, 2677 (2009) (quoting <u>Matsushita v. Zenith Radio Corp</u>., 475 U.S. 574, 587 (1986)).

## III.    FACTUAL BACKGROUND

The forecast of evidence in the light most favorable to the non-movant is as follows:

This matter arises from an incident that occurred on December 5, 2016 wherein Plaintiff was repeatedly stabbed and seriously injured by a fellow inmate, Reginald Gray, immediately upon Plaintiff's exist from the shower. The material facts surrounding the stabbing and Plaintiff's injuries are undisputed.    In this case, Plaintiff asserts a claim under the Eighth Amendment for the prison official Defendants' failure to protect him.

In 2016, Lanesboro was a close custody facility housing approximately 1,800 inmates.[6]  [Doc. 73-5 at ¶ 8.  Many of those inmates were validated gang members with close ties to known gangs in the Charlotte, North Carolina area, and many were incarcerated for violent crimes.  [Id.].  Plaintiff is currently serving a nearly 35-year sentence for rape of and taking indecent liberties with a minor.  [Doc. 73-1 at 1-3].  In 2016, he was housed at Lanesboro.

On December 5, 2016, Defendant Solomon was employed by the North Carolina Department of Public Safety (NCDPS) as the Director of Prisons.  [Doc. 73-5 at ¶ 2: Solomon Dec.].  Defendant Solomon was responsible for the administration of prisons in North Carolina.  [Id. at ¶ 3].  At this time, Defendant Beaver was employed by the NCDPS as an Assistant Superintendent, also known as an Assistant Warden, at Lanesboro.  [Doc. 73-2 at ¶ 2: Beaver Dec.].  Defendant Beaver immediately supervised the Unit Managers at Lanesboro.  He was responsible for ensuring consistency and quality of operations and ensuring that the authority and responsibility

---

[6] The Court takes judicial notice of the fact that, in 2019, Lanesboro was converted to a women's prison and renamed Anson Correctional Institution.

delegated to the units was effectively managed. [Id. at ¶ 3]. Defendant Mitchell was the Superintendent of Lanesboro at the relevant times.[7]

On December 5, 2016, Defendant Mims was employed by the NCDPS as a Captain at Lanesboro, and was the Officer-in-Charge and served as an advisor and consultant to other department heads in security matters. [Doc. 73-3 at ¶ 2-3: Mims Dec.]. Defendant Mims was responsible for the perimeter, yard, and internal hallway security, controlling movements, entry and exit from the institution and all buildings, excluding individual units. Defendant Mims was also responsible for formal offender counts, maintaining logs of events, and monitoring security systems. [Id. at ¶ 3]. Defendant Mims was also the leader of the Security Risk Group (SRG), or gang, Team at Lanesboro. [Id. at ¶¶ 3, 9].

At all relevant times on and prior to December 5, 2016, Lanesboro had an SRG Team. [Doc. 73-2 at ¶ 9; see Doc. 73-5 at ¶ 9]. The SRG Team consisted of at least one Captain, one Lieutenant, and Correctional Officers. The SRG Team met regularly with known gang leaders to gain valuable information regarding gang activity, which was used to change housing assignments, job assignments, and program assignments. [Id. at ¶ 9]. As

---

[7] Because the Court will strike Defendant Mitchell's Affidavit, there is no further forecast of evidence regarding Defendant Mitchell specifically.

11

SRG-related information was learned, it was passed to the relevant Unit Managers and Assistant Unit Managers to inform their staff of possible issues involving inmates under their supervision. [Id.]. The SRG Team also met with the Superintendent and Assistant Superintendents to discuss SRG-related issues, including any safety concerns and recommendations to resolve or prevent those concerns. [Id.].

The management at Lanesboro had at least monthly management meetings to discuss all prison issues and any trends the staff was seeing within the inmate population. [Id. at ¶ 8]. The meetings included the Superintendent (Warden), Assistant Superintendents, Unit Managers, Officers-in-Charge (Captains and Lieutenants), and Section Heads, including the SRG Team. [Id.]. The management meetings included discussions regarding the general operation of the facility, including, among other things, gang activity, significant acts of violence, and presence of contraband and weapons. [Id. at ¶ 8; see Doc. 73-5 at ¶ 9]. Staff discussed these issues and worked together to find solutions for them. [Id. at ¶ 8].

Despite efforts to validate all SRG (i.e., gang) members, some inmates who were suspected of SRG activity were not able to be validated as SRG members. [Id. at ¶ 10]. Furthermore, there were too many validated SRG members to separate them into housing units separate from non-members.

12

Even if it were feasible, the Defendants considered this measure to be ill advised due to security concerns. As such, validated SRG members were housed throughout the facility. [Id. at ¶ 10].

In 2015 or early 2016, the NCDPS invited the North Carolina State Highway Patrol, North Carolina State Bureau of Investigation, Federal Bureau of Investigation, and local law enforcement agencies to Lanesboro. [Doc. 73-5 at ¶ 10]. More than 30 outside law enforcement agencies participated. These agents met with each shift/rotation at Lanesboro to show support to the staff and to inform the staff that any misconduct would be appropriately disciplined and/or prosecuted. [Id]. The agents also met with the inmates in each housing unit to allow them to voice concerns and complaints. Finally, the agents met with management to discuss ways in which safety could be improved. [Id.].

At some point in 2015 or 2016, the NCDPS allowed for the hiring of additional officers at Lanesboro. In addition to those newly created positions, in approximately May of 2016, Lanesboro received even more officers as a result of NCDPS's conversion of the nearby Brown Creek Correctional Institution from a medium-custody facility to a minimum-custody facility. [Id. at ¶ 11]. Both efforts resulted in additional officers being allocated to Lanesboro to promote a "safe atmosphere." [Id.].

In approximately 2016, NCDPS implemented a new program at Marion Correctional Institution ("Marion"), also located in the Western District of North Carolina, that was dedicated to re-educating inmates who had a pattern of assaultive behavior. [Doc. 73-5 at ¶ 13]. Marion was chosen to host the program because it had 24-man cell blocks, which were smaller and thus made it easier to safely handle dangerous inmates. [Id.]. Many of the assaultive inmates at Lanesboro were transferred to Marion to participate in the re-education program. [Id.].

One of the goals of the State of North Carolina Department of Correction Division of Prison's Policy & Procedures ("NCDPS Policies") and the Lanesboro Standard Operating Procedures ("Lanesboro SOPs") was to promote inmate safety and prevent inmate violence. [Doc. 73-2 at ¶ 5]. The NCDPS Policies prohibit inmates from possessing weapons, fighting, making threats, and cursing. The NCDPS Policies also prohibit inmates from participating in any gang or SRG. [Id.]. To the extent an inmate fears for his safety, he can request Protective Custody. [Id.; Doc. 73-3 at ¶ 5 (citing NCDPS Policy C.1100, et seq.)]. The Lanesboro SOPs mirrored the NCDPS Policies but also added specific SOPs for Dormitory Rules and Possession of Tools/Equipment. The Dormitory Rules prohibited altering any lock, door, or window in order to prevent the fashioning of any weapons. [Id. at ¶ 6].

14

Correctional Officers and other staff at Lanesboro were responsible for ensuring that the NCDPS Policies and Lanesboro SOPs were followed by all inmates. [Id. at ¶ 7].

Prior to December 5, 2016, officers were regularly reminded to check inmate cell doors for any issues. If a cell door was deemed altered, the inmate, his cell, and his belongings were searched. [Id. at ¶ 14]. Furthermore, if a cell door had been altered, the prisoner was moved to a different cell until maintenance could fix the door. If it were discovered that a door-jam plate had been altered or removed, it was replaced and/or tac-welded back into place. [Id.]. In December 2016, however, inmates removing door-jam plates was a relatively new issue. [Id.]. Despite all the policies, procedures, and efforts taken to ensure a safe environment, "inmates find incredibly creative ways to manufacture, possess, and conceal contraband (including weapons)." [Doc. 73-5 at ¶ 14].

Further, NCDPS policy requires a complete search of every prison at least once every six months. [Doc. 73-6 at 12: NCDPS Policy F.0108]. It is not necessary for the entire facility to be searched on the same day, so long as all parts of the facility get searched once each six months. [Id.]. Between 2014 and 2016, Lanesboro was searching many of its units on a more frequent basis. [Doc. 73-5 at ¶ 12]. Prison Emergency Response Teams

15

(PERT) from multiple regions, consisting of approximately 250 additional officers, went to Lanesboro to conduct facility searches. The searches, which were highly effective, were used to discover and dispose of contraband, including weapons. [Id.].

Cell searches were conducted in Union Unit, where inmate Gray attacked Plaintiff, in February 2016, May 2016, and September 2016 (prior to the stabbing).[8] [Doc. 73-2 at ¶ 13]. A record from July 2016, which is labelled an "Incident Report," reflects a compilation of data from searches conducted throughout the prison from January 2016 to June 2016. [See Doc. 73-2 at 33-34]. That Report shows that only 27 cells in Union Unit had been searched as of the end of June 2016. [Id. at 33]. Defendant Mims is listed as the "Reviewing Authority" of the Report. Mims noted that 778 inmates were searched during that timeframe and that "based on all the information obtain[ed] during this incident it clearly shows that the facility is in compliance [with] policy [and] procedure for and [sic] institutional search." [Id. at 34]. The September 2016 record shows that cells in Union Unit D and E Pods were searched, but do not reflect that cell searches were conducted in B Pod, which was known at Lanesboro as a gang member pod. [Id. at 36; Doc.

---

[8] Defendants Beaver and Mims also claim that cell searches occurred in Union Unit in July 2016, citing a particular cell search record. [See id. at ¶ 13; Doc. 73-3 at ¶ 13]. This record, however, does not show that such searches were conducted in July 2016.

16

81 at 2]. Moreover, none of the records submitted by Defendants show that any cells in B Pod were searched in 2016, despite Defendant Mims' conclusion that Lanesboro was "clearly" in compliance with policy. Further, these records show that Defendant Beaver was notified of and approved the records associated with the May 2016 search and was notified of the July 2016 Report. [See Doc. 73-2 at 29-30, 34].

On December 4, 2016, at approximately 8:00 p.m., Plaintiff was moved from Moore Unit to Union Unit, B Pod. [Doc. 81 at 2]. Plaintiff expressed to Sergeant Brown that he did not feel safe in B Pod because of the history of gang member assaults there. [Id.]. Sergeant Brown had assisted Plaintiff with his move, and Plaintiff told Brown to put him in a different Pod. Brown refused. [Id.]. Plaintiff then filed an emergency grievance that night requesting to be moved out of B Pod. Nothing was done with respect to Plaintiff's grievance. [Id. at 3]. The next morning, on December 5, 2016, Plaintiff went to Sergeant Krantz three times, with Unit Manager Limeman present the third time. Both refused to move Plaintiff and ordered him back to his Pod. [Doc. 81 at 3; Doc. 81-2 at 3]. Plaintiff complied. [Doc. 81 at 3].

After eating lunch, Plaintiff waited "for count." Plaintiff then wanted to shower. He had heard nothing back on his emergency grievance and had yet to unpack his property. [Id.]. Plaintiff waited for his shower without

exchanging words with anyone and without any type of confrontation. Plaintiff was already frightened for his safety and "wasn't about to make it worse." [Id.]. Plaintiff entered the shower when it was his turn, with only a pair of pocketless black shorts, boxer shorts, a towel, and shower shoes. [Id. at 4]. He was unarmed. [Id. at 7].

As soon as Plaintiff pulled the shower curtain closed, inmate Reginald Gray started "hollering at [the Plaintiff]." [Id. at 4]. Inmate Gray is a high-ranking member of the Blood gang and who had been convicted of first-degree murder. [Id. at 7-8]. Unbeknownst to Plaintiff, inmate Gray was pacing back and forth outside the shower area the entire time Plaintiff was showering.[9] [Id. at 4, 7]. Plaintiff exited the shower with his head down. [Id. at 4]. As he first looked up, he saw inmate Gray in motion to strike his first blow against Plaintiff. Gray struck Plaintiff's right eye with a knife. The knife had an eight-inch long, two-inch wide blade that was made from a cell door plate. [Id. at 5; Doc. 88 at 3]. Gray then stabbed Plaintiff in the neck and abdomen "many time[s]." [Id.]. Plaintiff fell to the floor and Gray continued the assault. [Id.]. When Plaintiff was on the floor, Gray pulled Plaintiff up using Plaintiff's right arm and stabbed Plaintiff in his right side, breaking the

---

[9] Plaintiff references video footage of the attack on him by inmate Gray and the record shows that Plaintiff, in fact, viewed this footage. The footage, however, has not been submitted to the Court by any party here. [See Doc. 81-3 at 2].

blade off inside of Plaintiff. [Id. at 5]. Gray then pulled out a second knife and "begun hitting [Plaintiff] on the buttock." [Id.]. In the end, Gray had stabbed Plaintiff 16 times and caused Plaintiff to lose his eye. [Doc. 88 at 4].

None of the Defendants were present at Lanesboro Union Unit, B Pod, at the time Plaintiff was attacked by inmate Gray, nor does to the forecast of evidence show they were aware of Plaintiff's emergency grievances or requests to be moved to a different unit. [Doc. 73-2 at ¶ 17; Doc. 73-3 at ¶ 19; Doc. 73-5 at ¶ 15; see Doc. 73-2 at 20; Doc. 73-3 at ¶ 22; Doc. 73-5 at ¶ 18]. The disciplinary investigation report prepared in response to the attack provided, in pertinent part, as follows:

> C/O Bynum reports on 12/5/16 at approx 1430 hours, while working Union 1 she observed I/M Gray punch I/M Lomick #2047233 who then fell backwards in the mezzanine shower of B Pod. She states that I/M Gray then stood over I/M Lomick and began stabbing I/M Lomick with a homemade [ ] knife. Code 4 was called. At that time staff came to assist. Hand restraints were placed on I/M Gray as he was escorted out of B Pod. While exiting the Pod I/M Gray screamed up to I/M Lomick "Die motherfucker!! Die!! Die!!["] Sgt Krantz, C/O's Jackson & Flores report that they witnessed I/M Gray assault I/M Lomick stabbing him in the facial area. SGT Holder reports responding to the assault and assisting in gaining control of I/M Gray.

[Doc. 73-2 at 40]. There is no evidence in the record that Plaintiff was disciplined or investigated for his role in the altercation. Further, a state

prosecutor sent Plaintiff information regarding the disposition of the criminal case against Gray for the assault, which identified Plaintiff as the victim. [Doc. 81-5 at 3].

Plaintiff asserts that "defendants knew staff and inmate[s] [were] never safe at any point, night or day."[10]  [Doc. 81 at 7].  Plaintiff also testifies that violence at Lanesboro was pervasive and asserts that an investigation and intervention by the State should have occurred much earlier.  [Id. at 15]. Plaintiff claims that, when Defendant Mitchell was transferred to Lanesboro, the facility had already "surrender[ed] to gang members and needed leadership.  Both staff and inmates needed protection.  [Doc. 81-2 at 5].  In fact, Defendant Mitchell was stabbed on three occasions within his first eight months at Lanesboro.  [Doc. 81 at 11; see Doc. 81-2 at 10; Doc. 81-10 at 84].  Plaintiff claims that Defendant Solomon knew of the condition of the prison, which was plagued by violence and corruption, particularly given the assaults on Mitchell.  [Doc. 81-2 at 5, 8].  Moreover, Solomon had the authority and responsibility to put the facility on lockdown, but he did not, instead allowing the facility to be run by gang members.  [Id. at 8].  And, as

---

[10] In several portions of his forecast of evidence, Plaintiff testifies to what others "knew." Given Plaintiff's pro se status, and giving him the benefit of a generous inference, the Court takes these portions of Plaintiff's testimony to mean that he has personal knowledge and observations by which he knows that the individual Defendants were informed of or observed the conditions which he asserts such officers "knew."

20

a result, the lives of non-gang member inmates were in danger.  [Id. at 9].
For years, the pervasive violence and gang activity continued, resulting in
serious injury to, and sometimes, death of inmates and staff.  [Id. at 10].  The
day after Gray's attack on Plaintiff, a deadly assault occurred at Lanesboro.
[Id. at 13].

## IV.    DISCUSSION

### A.    Sovereign Immunity

Plaintiff here purports to sue Defendants in their individual and official
capacities.  A suit against a state official in his official capacity, however, is
construed as against the state itself.  Will v. Michigan Dep't of State Police,
491 U.S. 58, 71 (1989).  It is well settled that neither a state nor its officials
acting in their official capacities are "persons" subject to suit under 42 U.S.C.
§ 1983.  Id.; see Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55
(1978).  Moreover, the Eleventh Amendment generally bars lawsuits by
citizens against non-consenting states brought either in state or federal
courts.  See Alden v. Maine, 527 U.S. 706, 712-13 (1999); Seminole Tribe
of Florida v. Florida, 517 U.S. 44, 54 (1996).

Although Congress may abrogate the states' sovereign immunity, it
has not chosen to do so for claims under 42 U.S.C. § 1983.  See Quern v.
Jordan, 440 U.S. 332, 343 (1979).  Likewise, North Carolina has not waived

its sovereign immunity by consenting to be sued in federal court for claims brought under 42 U.S.C. § 1983. See generally, Mary's House, Inc. v. North Carolina, 976 F.Supp.2d 691, 697 (M.D.N.C. 2013) (claim under 42 U.S.C. § 1983 barred by sovereign immunity of North Carolina). As such, Defendants are entitled to summary judgment on the Plaintiff's claims against them in their official capacities and the Court will grant Defendants' Motion for Summary Judgment as to those claims.[11]

## B.    Failure to Protect

Claims under 42 U.S.C. § 1983 based on an alleged failure to protect fall within the Eighth Amendment's prohibition against cruel and unusual punishment. Under the Eighth Amendment, "prison officials have a duty … to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994) (quotation marks omitted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." Id. at 834.

---

[11] In the "Relief" section of Plaintiff's Third Amended Complaint, he states that he "[has] a right to protection from other prisoner[s]." [Doc. 44 at 5]. To the extent Plaintiff intended to seek injunctive relief here, Plaintiff has been transferred from Lanesboro. Any claim for injunctive relief is, therefore, moot. See Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007). As such, the Ex Parte Young exception to sovereign immunity, which allows official capacity claims in § 1983 actions to proceed where a plaintiff seeks prospective injunctive relief, does not apply. See Ex Parte Young, 28 S. Ct. 441 (1908).

To be found liable under the Eighth Amendment based on a failure to prevent harm, the prisoner first "must show that he was incarcerated under conditions posing a substantial risk of serious harm." Id. (citation omitted). Next, the prisoner must show that the prison official had a sufficiently culpable state of mind. Id. (quotation marks and citation omitted). "In prison-conditions cases, that state of mind is one of deliberate indifference to inmate health or safety." Id. (quotation omitted). "Deliberate indifference" is measured subjectively. The Supreme Court has described the standard as follows:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference…. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." … But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Farmer, 511 U.S. at 837-38 (emphasis added). A prison official is not liable if he knew the underlying facts but believed, even if unsoundly, that the risk to which the facts gave rise was insubstantial or nonexistent. Farmer, 511

U.S. at 837. Subjective awareness of a significant risk may be shown either through direct or circumstantial evidence of actual knowledge. <u>Makdessi v. Fields</u>, 789 F.3d 126, 132-33 (4th Cir. 2015). However, "prison officials who actually knew of a substantial risk to inmate safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." <u>Farmer</u>, 511 U.S. at 844. Nonetheless, the Supreme Court has also noted that,

> If an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

<u>Id.</u> at 842-43 (quotation marks omitted).

Where prison official defendants in a failure to protect case are supervisors without personal involvement in the incident, such supervisors "may be held liable under a tacit authorization theory if that supervisor fails to take action in response to a known pattern of comparable conduct occurring before the incident at issue took place." <u>Danser v. Stansberry</u>, 772 F.3d 340, 350 (4th Cir. 2014) (citation omitted). Furthermore, "the Eighth

Amendment requires more than <u>some</u> action: It requires <u>reasonable</u> action."
<u>Cox v. Quinn</u>, 828 F.3d 227, 237 (4th Cir. 2016) (citing <u>Farmer</u>, 511 U.S. at
844, 114 S. Ct. 1970). Finally, "[w]hile occasional, isolated attacks by one
prisoner on another may not constitute cruel and unusual punishment, …
confinement in a prison where violence and terror reign is actionable."
<u>Woodhous v. Com. of Va.</u>, 487 F.2d 889, 890 (4th Cir. 1973) (internal citation
omitted).

Defendants' forecast of evidence focuses on demonstrating certain
measures taken at Lanesboro to identify and address issues related to
contraband and violence, particularly related to gang or SRG activity. In
2015 or early 2016, for example, somewhat drastic measures were
undertaken to address issues at Lanesboro when the NCDPS, for which
Defendant Solomon was the Director of Prisons, invited agents from the NC
State Highway Patrol, the SBI, the FBI, and local law enforcement agencies
to Lanesboro, in part, to warn staff that they would be appropriately
disciplined and/or prosecuted for misconduct and to meet with inmates to
allow them to voice complaints and concerns. Such measures would not
have been undertaken absent some seriously problematic conditions
existing at Lanesboro. And Defendants would certainly have organized,
been aware of, and/or participated in this event, as well as the other

25

measures taken at Lanesboro to reduce violence.

The forecast of evidence also shows that Defendant Mims, with Defendant Beaver's knowledge, reported that Lanesboro was "clearly" in compliance with NCDPS policy requiring that all cells be searched for weapons and other contraband at least every six months, when only 27 cells in Union Unit, and none in B Pod, had been searched that year. From this forecast a jury could reasonably infer that the Defendants purposefully falsified the report concerning compliance with the safety requirements in order to cover up their complete failure to implement the safety protocols. Such would directly undermine the policies that were adopted to prevent the exact type of harm suffered by Plaintiff here. Furthermore, the forecast of evidence shows that B Pod of Union Unit was a gang member Pod. As such, it was in most desperate need of the requisite, though unconducted, searches. From this forecast a jury could reasonably infer that B Pod was essentially surrendered to gang members, thus abdicating Defendants' responsibility to provide a sufficiently safe environment.

The question before the Court is whether a reasonable jury could draw the inference from the forecasts presented that the Defendants (1) were aware of the facts showing the danger to the Plaintiff, (2) subjectively understood those facts to give rise to a substantial risk of serious harm, and

(3) that any remedial actions taken were not a reasonable attempt to alleviate that risk. <u>Farmer</u>, 511 U.S. at 837-38. Whether Defendants were subjectively aware of the substantial risk of serious harm can be shown through direct or circumstantial evidence, including evidence that the risk was so obvious based on what a defendant knew that he must have made the inference. <u>See</u> <u>Makdessi</u>, 789 F. 3d at 132-33; <u>Farmer</u>, 511 U.S. at 842-43. Furthermore, a defendant does not avoid liability by taking some, though not reasonable, action in response to a perceived substantial risk. <u>Cox</u>, 828 F.3d at 237.

Viewing the forecast of evidence and any inferences therefrom in Plaintiff's favor, <u>Anderson</u>, 477 U.S. at 255, the Court concludes that there remain genuine issues of material fact that preclude summary judgment as to all Defendants. The forecast of evidence shows, in part circumstantially, that all Defendants were aware of facts from which a substantial risk of serious harm at Lanesboro could easily be inferred. Furthermore, the forecast of evidence also shows that the risk was so obvious, and accepted up the ranks of Lanesboro and the NCDPS as to be the subject of extra-institutional efforts to improve security, reduce corruption, and reduce violence and gang activity. As for the third element, the forecast of evidence shows that the Defendants did not even implement the remedial measures

they deemed necessary for safety. See Farmer, 511 U.S. at 844. A jury can find such to be entirely unreasonable. Moreover, the unreasonableness of Defendants' actions remains a jury question particularly to the extent that an inference can be drawn that Defendants Mims and Beavers intentionally concealed their failure to take reasonable remedial measures.

Notwithstanding all of the foregoing, the Defendants' argue they are entitled to qualified immunity. [Doc. 73 at 18-19]. They are not. Qualified immunity shields "government officials performing discretionary functions … from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "It has long been established that jail officials have a duty to protect inmates from a substantial and known risk of harm, including harm inflicted by other prisoners." Cox, 828 F.3d at 239 (citing Farmer, 511 U.S. at 833). Here, the forecast of evidence taken in the light most favorable to the Plaintiff shows that the Defendants had the opportunity to address this duty in a deliberate fashion yet failed to follow through on simple incidents thereto. As such, the Defendants are not entitled to summary judgment on the issue of qualified immunity.

As such, genuine issues of material fact remain for trial in this matter.

Summary judgment for Defendants on Plaintiff's individual capacity claims is, therefore, inappropriate.

The Court will grant Plaintiff's motion to substitute the colored photographs for the photographs he previously submitted with his summary judgment response.

## V. CONCLUSION

In sum, for the reasons stated herein, the Court denies summary judgment for Defendants on Plaintiff's individual capacity claims and grants summary judgment for Defendants on Plaintiff's official capacity claims.

## <u>ORDER</u>

**IT IS, THEREFORE, ORDERED** that Defendants' Motion for Summary Judgment [Doc. 72] is **DENIED IN PART** as to Plaintiff's individual capacity claims and **GRANTED IN PART** as to Plaintiff's official capacity claims.

**IT IS FURTHER ORDERED** that the Declaration of David Mitchell [Doc. 75-1] is hereby **STRICKEN** from the record in this matter.

**IT IS FURTHER ORDERED** that Plaintiff's motion to substitute color photographs [Doc. 87] is **GRANTED**.

**IT IS SO ORDERED.**

Signed: February 1, 2021

Martin Reidinger
Chief United States District Judge